Filed 10/14/14  P. v. Leong CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)


| | |
|---|---|
| THE PEOPLE, | C068260 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F09096) |
| v. | |
| CHRISTOPHER LEONG, | |
| Defendant and Appellant. | |
| THE PEOPLE, | C069105 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F09096) |
| v. | |
| JUAN CARLOS CARRANCO, JR., | |
| Defendant and Appellant. | |


This case arises from a homicide on October 31, 2009, and two drive-by shootings five weeks later.  Defendants Christopher Leong and Juan Carlos Carranco, Jr., were charged in a consolidated information with the attempted murder of Jessie Mena (Pen.

1

Code, §§ 664/187, subd. (a); count two),[1] shooting at an occupied vehicle (§ 246; count three), and shooting at an inhabited house (§ 246; count four); Carranco and Manuel Miguel Sotelo were charged with the first degree murder of Carlos Cervantes (§ 187, subd. (a); count one); and Carranco alone was charged with felony evading a peace officer with willful disregard for public safety (Veh. Code, § 2600.2, subd. (a); count five). The information also alleged various gun (§ 12022.53, subds. (b), (c), (d), & (e)(1)) and gang (§ 186.22, subd. (b)(1), (4)) enhancements. Carranco's motion to sever count one from the trial of the remaining counts was granted, and the trial of count one was ordered to trail the trial of counts two through five.[2]

A jury found defendants guilty of attempted murder, shooting at an occupied vehicle, and shooting at an inhabited house, and Carranco guilty of evading a peace officer with willful disregard for public safety. The jury also found true allegations Leong intentionally and personally discharged a firearm in the commission of the attempted murder of Mena, and that defendants were principals in the attempted murder and that at least one principal intentionally and personally discharged a firearm in the commission of that offense. The jury further found true allegations the attempted murder, shooting at an occupied vehicle, and shooting at an inhabited dwelling offenses were committed for the benefit of, or in association with, the Norteño criminal street gang, and with the specific intent to promote, further, or assist the Norteños or any member of that criminal street gang.

A second jury found Carranco not guilty of the first degree murder of Cervantes but guilty of the lesser included offense of second degree murder. The jury also found

---

[1]   Further undesignated statutory references are to the Penal Code.

[2]   Manuel Sotelo later pleaded no contest to one count of assault with a deadly weapon and admitted the gang enhancement in exchange for an agreed upon sentence of eight years in state prison.

true allegations Carranco intentionally and personally discharged a handgun, and thereby proximately caused the death of Cervantes, and the murder was committed for the benefit of, or in association with, the Norteño criminal street gang, and with the specific intent to promote, further, or assist the Norteños or any member of that criminal street gang.

The trial court sentenced Leong to an aggregate term of 30 years to life in state prison, consisting of 15 years to life for shooting at an occupied vehicle and a consecutive 15 years to life for the shooting at an inhabited house. The trial court stayed Leong's sentence for attempted murder pursuant to section 654.

The trial court sentenced Carranco to an aggregate term of 70 years to life, plus 13 years in state prison, consisting of 15 years to life for second degree murder, plus 25 years to life for the gun enhancement, plus 10 years for the gang enhancement; a consecutive 15 years to life for shooting at an occupied vehicle; a consecutive 15 years to life for shooting at an occupied dwelling; and a consecutive three years for evading. The trial court stayed Carranco's sentence for attempted murder pursuant to section 654.

Defendants filed separate appeals, which we consolidated on our own motion for purposes of oral argument and decision only.

Defendants raise claims of evidentiary error and prosecutorial misconduct. We shall conclude that defendants forfeited most of their claims by failing to raise them below, and in any event, all but one fails on the merits. As to the sole meritorious claim, we shall conclude the error was harmless under any standard. Accordingly, we shall affirm the judgments in their entirety.

FACTUAL AND PROCEDURAL BACKGROUND

A. Jury Trial Number 1 (Counts Two through Five)

On the evening of December 9, 2009, Jessie Mena was visiting a friend at the Dewey Garden Apartments on Dewey Boulevard and Falconer Way in the south area of Sacramento. He left around midnight and, as he was walking to his car on Falconer Way, he saw a white Ford Taurus slowly drive past him. The car was full of males, and the

3

male seated in the front passenger seat was hanging out of the window looking around. Mena did not have a "good feeling," so he hurried to his car, got inside, and attempted to leave. As he was headed down Falconer Way toward Dewey Boulevard, the Taurus circled back around, and the male seated in the front passenger seat began shooting. Mena sped up, turned into a parking lot "to try to avoid getting shot," jumped out of his car, and ran about 15 yards to his friend's apartment. As he turned into the parking lot, a shot hit the passenger door of Mena's car, and his back window shattered. Once back inside his friend's apartment, he told his friend's father Larry Trejo that someone was shooting at him.

The male who fired the shots was "light-skinned." Mena knew the male was not Black but otherwise could not identify his race. Mena believed the male who fired the shots was wearing a white or light-colored shirt.

Trejo heard approximately five gunshots after Mena left the apartment. Trejo telephoned law enforcement approximately five minutes after Mena returned to the apartment and was placed on hold for approximately two minutes. Officers were dispatched to the scene at 12:40 a.m.

According to Trejo, it was not uncommon to hear gunshots around the apartment complex. The apartment manager's grandson, Eddie Lerna, resembled Mena and drove a similar car. Trejo did not know if Lerna was in a gang but testified that he wore a lot of red clothing and got "into problems a lot."

Mena denied belonging to a gang, ever being associated with a gang, or having any enemies. He had never seen the white Taurus prior to the shooting.

Ten spent shell casings were found near the intersection of Falconer and Dewey. The casings "traveled from the intersection . . . approximately . . . 30 feet." A projectile consistent with a bullet was found in a bucket outside the apartment complex's laundry room.

4

Meanwhile, at 12:29 a.m. that same morning, Sacramento Police Officer Mario Valenzuela was parked alongside Officer Ralph Knecht in the area of 21st Avenue and Bradford when he heard about four gun shots north or northwest of their location. Valenzuela and Knecht began looking for vehicles leaving the area. Knecht positioned himself along 21st Avenue because it is a main thoroughfare, and one or two minutes later, a call came over the radio stating that there had been a "possible drive-by shooting in the area of 17th Avenue," the same general area where Valenzuela said he heard the gunshots. No more than a minute later, Knecht saw a "white sedan" "shoot across" 21st Avenue on 71st Street. The car was travelling at a "decent rate of speed" and was coming from the area where the shots had been fired. Knecht "went to try to catch up to it," and when he did so, he noticed the car did not have a license plate. Knecht notified dispatch that he was making a traffic stop of a white Ford Taurus with approximately six occupants and then activated his overhead lights. When the Taurus failed to stop, Knecht activated his siren and a pursuit ensued. During the approximately 12-minute pursuit, the Taurus ran 13 stop signs and numerous stop lights and reached speeds of upwards of 80 miles per hour. Knecht did not observe anyone throw anything out of the Taurus during the pursuit; however, he lost visual contact with the Taurus several times such that he would not have been able to see if something was thrown from the car.

The pursuit ended after the Taurus experienced mechanical problems. All six occupants were ordered out of the Taurus at gunpoint. Carranco was seated in the driver's seat, and Leong was seated in the front passenger seat. The other occupants were Phoenix Allianic, Justin Guerrero, Cesar Santana, and David Hinnen. Leong, who is Asian, was wearing a white, black, and green striped shirt.

Defendants were placed together in the backseat of Knecht's patrol car and were recorded by the car's "in-car camera." On the recording, a male voice can be heard stating, "I ditched it."

5

The Taurus involved in the pursuit matched the description of the vehicle given by Mena earlier that morning. At approximately 1:00 a.m., Mena was brought to the location where the pursuit ultimately ended, and he identified the white Taurus involved in the pursuit as the same car that was involved in the shooting on Falconer Way. Mena was "100 percent sure that it was the same vehicle."

The Taurus was searched, and no firearm was found. There was one spent shell casing and one live bullet underneath the front passenger seat, one shell casing between the driver's side window and the front windshield, a spent round that someone shot into the car at some point in the trunk, and another spent round that someone shot into the car on the floorboard.

Officers also searched the pursuit route, particularly those areas where Knecht lost sight of the Taurus, and no gun was found.

At 1:10 a.m., a forensic investigator arrived at 7512 17th Avenue. She observed five 40-caliber shell casings in the street in front of the house, a spent bullet on the driveway, two bullet holes through the front window of the residence, one bullet hole in the garage door, and one bullet hole in a car parked in the driveway. The residents were a couple in their forties or fifties.

At approximately 2:40 a.m., defendants' and the other occupants' hands were tested for gunshot residue. According to the prosecution's expert in gunshot residue analysis, gunshot residue consists of particles containing lead, barium, and antimony. These chemicals exist separately inside the primer cup inside the shell. When the gun is fired, however, the mixture vaporizes and the chemicals fuse together. The combination of lead, barium, and antimony does not exist in nature and is not used in any common industry -- the "only occurrence that has been found for these particles is from the discharge of a firearm." "Because these chemicals existed separately, when they are vaporized there's no guarantee [all three] will condense together. So what that means is we have an opportunity to produce particles that contain lead, barium, and antimony, but

6

we also have opportunities to get two-component particles, lead and barium, lead and antimony, or antimony and barium." Gunshot residue has no adhesive properties, and thus, can be removed quite easily. Eighty percent of gunshot residue falls off a moving object or person within two hours. The expert further explained that "if a person has gunshot residue particles detected on them, that means they either fired a weapon, handled a weapon that had been fired, or ammunition that had been fired, or they've been near a weapon when it was discharged." In cases where only one or two particles of gunshot residue are detected, secondary transfer cannot be ruled out.

There was one lead, barium, and antimony, six lead and antimony, and eight lead-only particles detected in the samples collected from Hinnen. There was one lead, barium, and antimony, one lead and antimony, and six lead-only particles detected on the samples collected from Allianic. There was one lead, barium, and antimony, and two lead and antimony particles detected on the samples collected from Guerrero. There were two lead, barium, and antimony, and two lead-only particles detected on the samples collected from Santana. There were four lead, barium, and antimony, nine lead and antimony, and 12 lead-only particles detected on the samples collected from Leong. There were 14 lead, barium, and antimony, 14 lead and antimony, one lead and barium, and five lead-only particles detected on the samples taken from Carranco. According to the expert, the amount of gunshot residue detected on the samples taken from Leong makes secondary transfer unlikely. The amount of gunshot residue detected in the samples collected from Carranco is inconsistent with secondary transfer; rather, it is consistent with firing a weapon, handling a fired weapon, or being near a weapon when it was fired.

According to the prosecution's firearm and tool mark identification expert, the shell casings collected from Falconer Way, 17th Avenue, and inside the Taurus were fired from the same semi-automatic firearm.

7

The prosecution's gang expert, Detective Donald Schumacher, was permitted to testify as an expert in Hispanic street gangs, specifically the Norteños. Schumacher had been a detective in the Sacramento Police Department's gang unit for over four years and specialized in Hispanic street gangs in the "south part of Sacramento," specifically the Norteños. He had served as the lead investigator on no less than 50 gang crimes and assisted in the investigation of at least one hundred others. He typically had contact with six to eight gang members per week. The contact typically involved "interviewing them for a case or . . . doing . . . proactive intel-type work," such as "the [ins] and outs of the gang itself, how it works, [and] who's in it . . . ." He also reviewed records and spoke with patrol officers and members of neighboring law enforcement agencies to gather information about Hispanic gangs, and in particular, the Norteños.

Schumacher opined that the Norteños are a criminal street gang, explaining that there are about 1,500 Norteño gang members within the County of Sacramento, they have a common symbol, the number 14 and the color red, and they claim all of Sacramento as their turf. There are a number of neighborhood subsets within the larger Norteño street gang in Sacramento, including the Varrio Diamonds and 14th Avenue, and there are rivalries among some of the subsets. Norteños have a common enemy, the Sureño criminal street gang. Gang members often show allegiance to their gang with tattoos. Any version of the number four or 14, which goes back to "N" being the 14th letter of the alphabet, is a common tattoo for Norteño gang members. Norteños also use various hand signs associated with the number 14, such as holding up one finger on one hand and four on the other.

When asked for his expert opinion as to the primary activities of the Norteños, Schumacher responded that he had "been part of investigations stemming from just graffiti to car thefts, burglaries, carjackings, sales of narcotics, drive-by shootings, possession of illegal firearms, all the way up to homicide."

8

Schumacher further opined that the Norteños were engaged in a pattern of criminal gang activity, explaining that he investigates two or three "Norteño crimes" on average per week, "whether they be assaults, shootings, or just follow up on maybe a gun possession case . . . ." The prosecutor asked Schumacher about "a couple of specific examples." First, the prosecutor asked Schumacher if he was "familiar with the crimes of attempted murder and shooting at an occupied vehicle committed by Mr. Bruno Martinez on August 5th, 2007." Schumacher indicated that he had "reviewed that case and talked to the investigating detective on that." He explained that Martinez, a Norteño, showed up uninvited to a birthday party at a local restaurant and got into a dispute with one of the partygoers. Martinez asked the partygoer where he was from, and the partygoer responded, "I'm not from anywhere. I don't gang bang." As the partygoer attempted to leave, Martinez pulled out a handgun and fired multiple shots into the partygoer's car.

The prosecutor also asked Schumacher if he was "familiar with the crime of attempted murder committed by Mr. [Gabriel] Torres on July 15th, 2007." Schumacher indicated that he was familiar with "that case" because he "reviewed the report, and . . . spoke to the investigat[ing] detective . . . ." According to Schumacher, Torres, a Norteño, and three others approached a group of people at a gas station and began calling them "scraps," a derogatory term for a Sureño gang member. When Torres and members of his group began calling out "Oak Park," one of the victims said, "[W]e're not from anywhere. We don't want any problems." Immediately thereafter, Torres picked up a metal trash can lid and threw it through the driver's window of the victim's car, striking the victim in the face. When asked if Torres had "a subsequent issue" in September 2007 Schumacher said Torres was present at a fist fight that occurred outside Torres' cousin's house. Torres's cousin saw a former Norteño gang member and began calling him a

snitch. A fist fight ensued, Torres's cousin knocked the former gang member to the ground, and Torres shot him multiple times.[3]

The detective had no personal knowledge concerning the facts of these cases; rather, he had reviewed three reports regarding the cases.

Schumacher was familiar with the Dewey Garden Apartments. He had been to the apartment complex and had been involved in investigations of suspects who lived there. From what he understood from a couple of independent sources, in late 2009, the apartment complex was primarily inhabited by Varrio Diamonds. Schumacher also was familiar with the manager of the apartment complex and her grandson, Eddie Lerna. Schumacher had contacted Lerna with a few other Varrio Diamonds at the apartment complex in 2007. Schumacher photographed Lerna, spoke to him, and validated him as a Varrio Diamonds gang member.

Referring to "the police department reports," the prosecutor asked Schumacher if he was familiar "with the address of the shooting on December 10th, 7512 17th Avenue," and Schumacher responded, "That's the address of a Varrio Diamonds gang member named Adam White." The prosecutor then asked Schumacher to tell him about the relationship between the Norteño subsets Varrio Diamonds and 14th Avenue.

---

**3** The prosecution also introduced court records showing: a jury found Martinez guilty of attempted murder and maliciously discharging a firearm at a motor vehicle on August 5, 2007, and found true allegations Martinez personally discharged a firearm in the commission of the attempted murder, and maliciously discharged the firearm at a motor vehicle for the benefit of, or in association with the Norteño criminal street gang, with the specific intent to further, promote, and assist criminal conduct by gang members; Torres had been charged with assault and felony vandalism arising out of the July 15, 2007, incident and had pleaded no contest to felony vandalism in exchange for dismissal of the assault charge; and Torres had been charged with two counts of attempted murder, along with firearm and gang enhancements, in connection with the September 10, 2007, incident and had pleaded no contest to two counts of assault with a deadly weapon and admitted the firearm and gang enhancements in exchange for a stipulated sentence.

Schumacher responded, "It's not a good relationship," explaining that in 2005, Tony Sotelo, a 14th Avenue gang member, shot and killed a Varrio Diamonds gang member in a bar fight. The victim was good friends with Adam White, and White's half-brother Kenny Anderson. Anderson was present during the shooting and identified Tony Sotelo as the shooter during an interview with police. The feud between the Varrio Diamonds and 14th Avenue continued past December 2009. Schumacher explained that in December 2010, a year after the drive-by shootings at issue, "we were . . . doing surveillance on the house next door to 7512 . . . when we actually saw a silver car pull up, subject get out and fire shots into the house in broad daylight." Following a short pursuit, Schumacher arrested two men, one of whom was Santana, a 14th Avenue gang member and one of the occupants of the white Taurus on December 9, 2009. Schumacher further testified that Tony Sotelo is the brother of Manuel Sotelo, and that Manuel Sotelo and Carranco were involved in the shooting death of an out-of-town Norteño on October 31, 2009, about five weeks before the shootings at issue in this case.

Schumacher opined that each of the occupants of the white Taurus was a Norteño gang member in December 2009. More particularly, he opined that Allianic was a member of the 14th Avenue subset because he admitted to being a Norteño to another officer, was photographed making a hand gesture of the letter "A," which is associated with the 14th Avenue subset, and repeatedly had been contacted with other Norteño gang members. He opined that Guerrero was a member of the Fruitridge subset because he had been contacted at least four times with other validated Norteño gang members, mostly from Fruitridge, and had been involved in several gang related crimes, including auto theft, possession of illegal firearms, and sales of controlled substances. Schumacher opined that Hinnen was a member of the Fruitridge subset because he had been contacted wearing gang clothing on multiple occasions, repeatedly associated with other gang members, mostly "Fruitridge Norteños," and had the letters "FR," which stand for Fruitridge, tattooed in red on his arm. He opined that Santana was a member of the 14th

11

Avenue subset because he had been contacted by officers in gang related clothing, had been contacted at least 11 times with other Norteño gang members, mostly 14th Avenue, had "AVE" tattooed on his hands, and had been photographed displaying the hand gesture "A," a common sign for 14th Avenue. He opined Leong was a member of the Fruitridge subset because he had been contacted at least three times with other Norteño gang members, most of whom were members of Fruitridge, and had been involved in crimes associated with gang members, including burglary, possession of concealed weapons, and sales of narcotics. Finally, Schumacher opined that Carranco was a member of the 14th Avenue subset because of his involvement with Manuel Sotelo, a member of 14th Avenue, in the shooting of an out-of-town Norteño in October 2009, and because he had been contacted at least twice with other gang members, had "14th Ave" tattooed on the inside of his index finger, had a large red "A" tattooed on his forearm, had a crossed out "S" or dollar sign tattooed on his body, which signifies disrespect for the Sureños, and had been photographed with other gang members wearing red and "throwing up" the hand sign "A," which is associated with 14th Avenue.

The prosecutor asked Schumacher the following hypothetical: "[A]ssume that there are six Norteño gang members of either 14th Avenue or Fruitridge in a car. [¶] They . . . drive to an area that is in a rival Norteño set's area, Diamonds' area. They see a man who resembles, both physically and by the car he's heading towards, a rival Diamonds' gang member, and they shoot approximately ten times at that person. [¶] Would you have an opinion as to whether that crime was committed for the benefit of, or in association with, the Norteño criminal street gang?" Schumacher responded, "[I]t most definitely was," explaining the car was full of Fruitridge and 14th Avenue gang members who, by shooting, "were trying to eliminate [a person] who they perceive to be a rival gang member."

Before posing a second hypothetical, the prosecutor asked Schumacher whether he was "aware of any facts that would lead you to the conclusion that Manuel Sotelo has

12

taken . . . the disagreement between Tony Sotelo, his brother, and the Kenny Anderson-Adam White faction personally?" Schumacher responded, "That would be a conclusion that I would very strongly consider . . . ." Among other things, Schumacher noted that Manuel Sotelo had the phrase, "Fuck Huero" on his left index finger," and "Huero" referred to Anderson. Schumacher further testified that according to the residents at 7512 17th Avenue, White and Anderson had been living at that address until about two months prior to the shooting.

The prosecutor then posed the following hypothetical: "[S]ix Norteños from either the 14th Avenue or Fruitridge subsets do a drive-by shooting on the 17th Avenue house that is intimately associated with Adam White and Kenny Anderson, Diamonds Norteños. [¶] The driver of the vehicle that does the drive-by is closely associated with Tony Sotelo's younger brother who has taken that disagreement personally to the point of getting a tattoo. [¶] Would you have an opinion as to whether that drive-by shooting was done for the benefit of, or in association with the Norteño criminal street gang?" Schumacher responded that "obviously it's [in] association with the gang and other gang members," noting that there were six gang members in the car.

During cross-examination, Schumacher acknowledged that he did not have any role in investigating the crimes in this case and agreed that "[his] opinions and the information [he's] providing today here, is based on reading reports." He concluded Leong was a Norteño based upon a review of various police reports; he personally had no dealings with Leong. Schumacher acknowledged that selling marijuana is not a "gang crime" because marijuana is not a controlled substance, and that Leong had been convicted of selling marijuana. He also agreed that persons other than gang members commit the other crimes Schumacher identified in relation to Leong -- burglary and gun possession.

13

B.    Jury Trial Number 2 (Count One)

On the night of October 30, 2009, Carlos Cervantes, Sonja Jones, Noe Alvarado, Israel Cuevas, and several others travelled from Marysville to south Sacramento to attend a party. There were between 30 and 100 people at the party, a number of whom appeared to be Norteño gang members based on their clothing and tattoos. Sometime after midnight, the party began to spill into the street and people started shouting the names of gangs. Most of these individuals, including Carranco, were shouting "14th Avenue." Others were shouting, "Diamonds," "Gardens," and "Crips." Cuevas had served a previous prison term and was not supposed to be in the presence of gang members, so Cervantes, Jones, Alvarado, and Cuevas decided to leave. Around this time, the individuals who had been chanting gang names began yelling and pushing Cuevas. A man with a large neck tattoo, later identified as Manuel Sotelo, told Cuevas that he "needed to learn respect." Meanwhile, three or four other men began punching and kicking Alvarado. When Jones threatened to break a bottle on the attackers' heads if they did not move away from Alvarado, the fighting ceased. Cervantes was not involved in the altercations; he was urging everyone not to fight.

After the fight, Cervantes, Jones, Alvarado, and Cuevas walked down the street and away from the party. When they reached the corner, Alvarado realized that his cell phone was missing, and the group returned to the party to look for it. When Alvarado asked the people at the party to identify the person who had attacked him, a number of people took responsibility and called Alvarado a "bitch" and a "punk." Alvarado said he did not want any problems and attempted to shake one man's hand. The man pushed Alvarado's hand away and started to walk off, which sparked an altercation between Cuevas and Manuel Sotelo. Alvarado and Cervantes joined in the scuffle, and a large brawl broke out. During the brawl, Cervantes stood in front of Alvarado and held his hands up in an effort to break up the fight. As the fight moved into the street, Carranco was hitting Cervantes while Cervantes was pushing him away. Jones then saw Carranco

14

point a gun at Cervantes's head and shoot. Another partygoer testified that she observed Carranco swing his right fist at Cervantes in an overhead motion and an instant later heard a gunshot and saw Cervantes on the ground. Cervantes later died as a result of the gunshot wound to his head.

Schumacher again testified for the prosecution as an expert in Hispanic street gangs, specifically Norteños. His testimony concerning the Norteños and their status as a criminal street gang that engaged in a pattern of criminal gang activity was identical in all material respects to that given at the first trial. In addition, Schumacher testified that he reviewed the facts of the case and researched Carranco's history. He had no information that Carranco had been involved in any criminal activity other than the shooting at issue and the two drive-by shootings in December 2009. He opined that Carranco was a member of 14th Avenue, a Norteño subset, at the time of the shooting. He based his opinion on the following: Carranco was repeatedly in the company of other Norteños; he had an "A" tattooed on his forearm; he had been photographed displaying 14th Avenue hand gestures with other gang members, including Manuel Sotelo; and he had participated in gang related crimes. In particular, Carranco was arrested on December 10, 2009, following two drive-by shootings and was later "convicted of both those events" and gang enhancements were found true. That case involved 14th Avenue members shooting at other Norteños.

Schumacher was given a hypothetical based on facts rooted in the evidence and opined that such a shooting was for the benefit of or in association with the Norteño criminal street gang. Schumacher explained that it was done in association with 14th Avenue because there were multiple members of that gang present. He explained that it was also for the benefit of the Norteños, even though the victim may have been a Norteño, because the victim was from out-of-town and was on 14th Avenue turf. According to Schumacher, Norteños fighting Norteños helps the gang as a whole "because the community sees this, other members of the gang see this, . . . people on the

15

street see this, and they realize that if these two Norteño gang members are fighting each other, what would they do to a citizen who actually came forward and said this is what I saw, . . . or I want to testify."

Carranco testified on his own behalf at trial. He admitted that he was a member of the Norteño criminal street gang and that he had been a member on the night of the shooting. He arrived at the party around 10:45 p.m. He recognized a number of people at the party, but the only person he knew personally was Manuel Sotelo. When people began shouting their "hoods," Carranco yelled out, "14th Ave" a couple of times. He remembered seeing Alvarado doing calisthenics in the street but denied ever seeing Cervantes prior to the shooting. He also denied being present at the party when the first altercation occurred, stating that he had gone to the liquor store to purchase some chewing gum. When he returned, he saw people fighting and was "blind-sided" by a punch to the left side of his face. Although he did not see who had punched him, he began punching Cervantes, who was standing nearby. Carranco exchanged blows with Cervantes, and at some point Carranco backed away, pulled out a semi-automatic handgun, and told Cervantes to "get back." When Cervantes moved closer and began punching Carranco in the face and head, Carranco began hitting him with the gun. As Carranco was swinging the gun at Cervantes, it went off. Carranco was shocked; he was not expecting the gun to go off and did not intend to shoot or kill Cervantes. He was trying to get Cervantes away from him.

Less than an hour after the shooting, Carranco sent the following text message: "I know, did his brains get all over the place? Haha, don't tell no one, at all for real, blood, on 14th Avenue, and tell them niggas, too . . . ." In a second text message, he wrote, "I did, but I can't sleep, I'm on . . . ." In a third text message, he stated, "I know, but fuck it, it's the Ave. over anything." Two days later, he sent another text message: "Was there blood all over your shoes from the other night? Ave. Gang."

16

Carranco admitted his involvement in two drive-by shootings five weeks after shooting Cervantes.

## DISCUSSION

### I

### Defendants' Sixth Amendment Rights to Confront and Cross-examine Witnesses Were Not Violated When the Gang Expert Relied on and Revealed to the Jury the Contents of Otherwise Inadmissible Hearsay

Citing *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford*), defendants contend their Sixth Amendment rights to confront witnesses were violated when the prosecution's gang expert related large amounts of testimonial hearsay to the jury "when testifying about his opinions about gang the enhancements." According to defendants, most of the details the expert related were "obtained through reading police reports and criminal trial records or through discussions with other police officers who had been involved in investigating the activity" and not from personal knowledge.

As a preliminary matter, the People claim defendants forfeited their claim by failing to raise it below. Generally, a failure to object on confrontation clause grounds forfeits the claim on appeal. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 290.) Defendants acknowledge that they did not raise the issue in the trial court, but contend that they have not forfeited it on appeal because any objection would have been futile under *People v. Gardeley* (1996) 14 Cal.4th 605, 618 (*Gardeley*), which holds that an expert witness may describe the material that forms the basis of his or her opinion, even if the material otherwise would be inadmissible. (*People v. Sandoval* (2007) 41 Cal.4th 825, 837, fn. 4 ["An objection in the trial court is not required if it would have been futile."].) As we

shall explain, *Gardeley* remains good law.  Accordingly, even assuming defendants' claim was preserved, it lacks merit.**4**

The Sixth Amendment to the federal Constitution guarantees a defendant's right to confront adverse witnesses.  (U.S. Const., 6th Amend.; see also *People v. Lopez* (2012) 55 Cal.4th 569, 576.)  In *Crawford*, the United States Supreme Court held that the prosecution may not rely on testimonial hearsay unless the declarant is unavailable to testify, and the defendant had a prior opportunity for cross-examination.  (*Crawford, supra*, 541 U.S. at p. 59, fn. 9.)  " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is *offered to prove the truth* of the matter stated."  (Evid. Code, § 1200, subd. (a), italics added.)  A statement which is not offered to prove the truth of the matter asserted does not constitute hearsay, and its use is not barred by the confrontation clause.  (*Crawford,* at p. 59, fn. 9 ["The Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted . . . ."].)

"California law permits a person with 'special knowledge, skill, experience, training, or education' in a particular field to qualify as an expert witness (Evid. Code, § 720) and to give testimony in the form of an opinion (*id.,* § 801).  Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.'  (*Id.*, subd. (a).)  The subject matter of the culture and habits of criminal street gangs, of particular relevance here, meets this criterion.  [Citations.]

"Evidence Code section 801 limits expert opinion testimony to an opinion that is '[b]ased on matter . . . perceived by or personally known to the witness or made known to [the witness] at or before the hearing, whether or not admissible, that is of a type that

---

**4**   Because we conclude defendants' claim lacks merit, we need not consider their alternative argument that their respective counsel were ineffective in failing to object.

18

reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the expert] testimony relates . . . .' (*Id.*, subd. (b).)" (*Gardeley*, *supra*, 14 Cal.4th at p. 617.)

It has long been the law in California that experts may base their opinions " 'on reliable hearsay, including out-of-court declarations of other persons.' " (*Gardeley*, *supra,* 14 Cal.4th at p. 618; see also Evid. Code, §§ 801, subd. (b).) "And because Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter . . . upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion." (*Gardeley,* at p. 618.)

In *Gardeley*, our Supreme Court concluded that a gang expert properly relied on and revealed to the jury the contents of otherwise inadmissible hearsay in testifying on direct examination that a hypothetical assault by three gang members was gang-related. (*Gardeley, supra*, 14 Cal.4th at pp. 611-613, 618-619.) The court reasoned that it was proper for the expert to relate the contents of the out-of-court statement to the jury because it was not offered for its truth but for the nonhearsay purpose of explaining the basis of the expert's opinion. (*Id.* at pp. 618-619.)

*Gardeley* was decided eight years before *Crawford*, and thus, does not address whether *Crawford* applies to out-of-court statements that are used as the basis for an expert's opinion. In *People v. Thomas* (2005) 130 Cal.App.4th 1202 (*Thomas*), our colleagues in the Fourth Appellate District, Division Two, considered the issue and found no *Crawford* violation. (*Thomas*, at pp. 1209-1210.) Relying on *Gardeley* and *Crawford's* admonition that the confrontation clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted, the court concluded that a gang expert, in opining that the defendant was a gang member, properly relied on and testified to the contents of hearsay statements by other gang members that the defendant was a gang member. (*Thomas*, at pp. 1206, 1208-1210.) The court

19

reasoned, "*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions.  This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion."  (*Id.* at p. 1210; see also *People v. Cooper* (2007) 148 Cal.App.4th 731, 746-747 ["*Crawford* was concerned with the substantive use of hearsay evidence . . . .  It did not suggest that the confrontation clause was implicated by admission of hearsay for nonhearsay purposes."]; *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1426-1427 ["Hearsay in support of expert opinion is simply not the sort of testimonial hearsay the use of which *Crawford* condemned."]; *People v. Sisneros* (2009) 174 Cal.App.4th 142, 153-154 [same].)

In *People v. Hill* (2011) 191 Cal.App.4th 1104, 1129-1130 (*Hill*), our colleagues in the First Appellate District, Division Five, questioned *Thomas's* reasoning, noting that *Gardeley* and *Thomas* were based on the "implied assumption that the out-of-court statements may help the jury evaluate the expert's opinion without regard to the truth of the statements.  . . .  But this assumption appears to be incorrect."  The court observed that "where basis evidence consists of an out-of-court statement, the jury will often be required to determine or assume the truth of the statement in order to utilize it to evaluate the expert's opinion."  (*Hill*, at p. 1131, fn. omitted.)  Nevertheless, the court concluded that it was bound by *Gardeley* and similar precedent supporting *Thomas*:  "But for the long line of California Supreme Court precedent supporting *Thomas*, we would reject that opinion . . . .  But our position in the judicial hierarchy precludes that option; we must follow *Gardeley* and the other California Supreme Court cases in the same line of authority."  (*Hill,* at p. 1131, fn. omitted.)  Thus, the court concluded that the admission of several out-of-court statements as expert opinion basis evidence, including a testimonial statement, violated neither the hearsay rule nor the confrontation clause

20

because they were not offered for their truth but only to evaluate the expert's opinions. (*Ibid.*)

"Since *Hill*, a majority of justices on . . . the United States Supreme Court . . . have indicated expert basis evidence *is* offered for its truth and subject to the confrontation clause. (*Williams v. Illinois* (2012) 567 U.S. ___ [183 L.Ed.2d 89, 132 S.Ct. 2221] (*Williams*) . . . .) In *Williams*, the defendant challenged a laboratory expert's testimony that a DNA report from a prior kidnapping, rape, and robbery—which was not introduced into evidence—matched a DNA sample taken from the defendant upon his arrest on unrelated charges. In a four-to-one-to-four decision, the court held there was no confrontation clause violation, but a majority of justices could not agree on a rationale. Justice Alito, in a plurality opinion joined by the Chief Justice and [Justices Kennedy and Breyer], reasoned the report was not offered for its truth, but for the limited purpose of explaining the basis for the assumptions underlying the expert's independent conclusion that the samples matched, and even if it was admitted into evidence for its truth, the report was not testimonial. (*Williams, supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2228] (plur. opn. of Alito, J.).) The five other justices in two opinions (Justice Thomas, concurring in the judgment, and Justice Kagan, joined by three other justices, dissenting) all expressed the view the report was offered for its truth, although Justice Thomas found it was not testimonial, while the dissenting justices found it was. (*Id.* at p. ___ [132 S.Ct. at p. 2257] (conc. opn. of Thomas, J.) ['[S]tatements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose.']; *id.* at p. ___ [132 S.Ct. at p. 2260] (conc. opn. of Thomas, J.); *id.* at pp. ___, ___ [132 S.Ct. at pp. 2268, 2271] (dis. opn. of Kagan, J.) [the expert's description of the report 'was offered for its truth because that is all such "basis evidence" can be offered for']; *id*. at p. ___ [132 S.Ct. at p. 2273] (dis. opn. of Kagan, J.).)" (*People v. Valadez* (2013) 220 Cal.App.4th 16, 31-32 (*Valadez*), italics added, fn. omitted.)

Defendants submit that "this development calls into question the continuing validity of *Gardeley*," reasoning that "a five person majority of the Supreme Court has repudiated the rational governing gang expert testimony enunciated in *Gardeley*." We agree -- to a point. As the court observed in *Valadez*, "If the *currently constituted court[]* [was] called upon to resolve this issue, it seems likely the holdings in *Thomas*, *Hill*, and other cases extending *Gardeley* to find out-of-court statements offered as expert basis evidence are not offered for their truth for confrontation purposes will be significantly undermined." (*Valadez, supra*, 220 Cal.App.4th at p. 32, italics added, fn. omitted.) This, however, has yet to occur.

When the U.S. Supreme Court issues an opinion, "it is not only the result but also those portions of the opinion *necessary to that result* by which we are bound. [Citations.]" (*Seminole Tribe of Florida v. Florida* (1996) 517 U.S. 44, 67 [134 L.Ed.2d 252, 273], italics added.) "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .' [Citation.]" (*Marks v. United States* (1977) 430 U.S. 188, 193 [51 L.Ed.2d 260, 266].)

In *Williams,* five Justices agreed that the extrajudicial basis of an expert's opinion is necessarily considered for its truth, but only one of those Justices (Thomas) concurred in the judgment; the other four Justices joined in the dissent. (567 U.S. at p. ___ [183 L.Ed.2d at p. 130] (conc. opn. of Thomas, J.); *id.* at pp. ___ [183 L.Ed.2d at p. 143] (dis. opn. of Kagan, J.).) Moreover, it cannot be said that those portions of the concurring and dissenting opinions were necessary to the result in that case, which was to affirm a judgment finding that the testimony at issue did not violate the confrontation clause. (*Id.* at p. ___ [183 L.Ed.2d at p. 112] (plur. opn. of Alito, J.); *id.* at p. ___ [183 L.Ed.2d at p. 129] (conc. opn. of Thomas, J.).) As the People point out, "To treat the opinions of four dissenters with one Justice concurring in the judgment as precedent would lead to an

absurd result because it would be precedent contrary to the result and judgment in the case."

We conclude that the common view expressed in the concurring and dissenting opinions in *Williams*, that the extrajudicial basis of an expert's opinion is necessarily considered for its truth, may *not* be taken as a holding of the United States Supreme Court since it is not yet the basis of any judgment. (See *People v. Dungo* (2012) 55 Cal.4th 608, 627-629 (conc. opn. of Chin, J.).) In other words, while the concurring and dissenting opinions in *Williams* may signal how the Court will rule in a future case, they have no precedential value here. We remain bound by *Gardeley*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Because the challenged evidence was admitted for the limited purpose of explaining the basis of Schumacher's opinions, its admission did not run afoul of the Sixth Amendment right to confrontation.[5]

We reject defendants' assertion that *Gardeley* is inapplicable because the trial court instructed the jury consistent with CALCRIM No. 332 that in evaluating expert testimony, it "must decide whether information on which the expert relied was true and accurate."[6] In *Gardeley*, the court stated: "Of course, any material that forms the basis

---

[5]   It appears our Supreme Court will have an opportunity to address this issue in the not too distant future. On May 14, 2014, while this case was pending on appeal, our Supreme Court granted a petition for review in *People v. Sanchez* (S216681). The Supreme Court news release issued when review was granted states: "This case presents the following issue: Was defendant's Sixth Amendment right to confrontation violated by the gang expert's reliance on testimonial hearsay (*Crawford v. Washington* (2004) 541 U.S. 36)?" (Cal. Supreme Ct., News Release (May 16, 2014) <http://www.courts.ca.gov/documents/ws051214.pdf> [as of September 19, 2014].)

[6]   The jury was instructed in the language of CALCRIM No. 332 as follows: "Witnesses were allowed to testify as experts and to give opinions. You must consider the opinions, but you're not required to accept them as true and correct. The meaning and importance of any opinion are for you to decide. [¶] In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. [¶] In addition, consider the expert's knowledge, skill, experience, training

23

of an expert's opinion testimony must be reliable. [Citation.] For 'the law does not accord to the expert's opinion the same degree of credence or integrity as it does the data underlying the opinion. *Like a house built on sand, the expert's opinion is no better than the facts on which it is based*.' [Citation.]" (*Gardeley, supra*, 14 Cal.4th at p. 618.) While the court in *Gardeley* did not mention CALCRIM No. 332, consistent with that instruction, the court plainly contemplated that the finder of fact would evaluate the basis of an expert's opinion in deciding how much weight to accord it. Nevertheless, the court concluded such basis evidence was not offered for its truth.

Finally, defendants' reliance on *United States v. Mejia* (2nd Cir. 2008) 545 F.3d 179 (*Mejia*) is misplaced. First, we are not bound by lower federal court decisions even on federal questions. (*People v. Bradley* (1969) 1 Cal.3d 80, 86.) Second, much of that decision, including portions cited by defendants, deals with the federal rules of evidence and not the confrontation clause. (*Mejia,* at pp. 194-198.) Third, unlike the police expert in *Mejia*, Schumacher did not transmit information he had learned during a custodial interrogation in this case to the jury. (*Id.* at p. 199.) Fourth, Schumacher relied on the challenged evidence as a basis for his opinions. In particular, he relied on the predicate acts to which he testified as a basis for his opinion that the Norteño criminal street gang was engaged in a pattern of criminal gang activity. And, as Carranco acknowledges, his testimony "about the murder case involving Manuel Sotelo's brother" formed the basis for his opinion that the drive-by shootings in the first trial were gang motivated. As detailed above, the admission of evidence, including testimonial hearsay, for this purpose

---

and education, the reasons the expert gave for any opinion and the facts or information on which the expert relied in reaching that opinion. [¶] *You must decide whether information on which the expert relied was true and accurate*, and you may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence." (Italics added.)

does not run afoul of the Sixth Amendment right to confrontation.[7]

For all the foregoing reasons, defendants' claim that Schumacher's testimony violated their rights under the confrontation clause fails.

II
The Trial Court Did Not Abuse Its Discretion Under Evidence Code Section 352 in Allowing the Gang Expert to Testify Concerning Carranco's Involvement in an October 2009 Shooting

Leong contends the trial court abused its discretion in the first trial by allowing the gang expert to refer to Carranco's involvement in the October 2009 shooting death of an out-of-town Norteño as a basis for his opinion that the drive-by shootings were gang motivated because "its slight probative value was substantially outweighed by its prejudicial effect." We shall conclude the trial court did not abuse its discretion, and even if it did, any error was harmless.

Carranco's trial counsel objected to the prosecution's gang expert, Schumacher, referring to the October 2009 shooting as a basis for his opinion that the two drive-by shootings were gang motivated. He argued such evidence was cumulative in that there was other evidence indicating the drive-by shootings were committed for the benefit of the Norteño criminal street gang, and while it "certainly may have relevance," it was more prejudicial than probative under Evidence Code section 352. The prosecutor countered that the evidence was relevant to show Carranco's intent and motive in committing the drive-by shootings. The trial court ruled the evidence was admissible "for the purpose of a part of the basis of the expert's opinion as it relates to motivation

---

[7] To the extent Carranco claims the prosecutor's *use* of the challenged evidence during his closing argument (as opposed to the trial court's admission of such evidence in the first instance) violated the confrontation clause, this issue was not properly briefed, lacking its own separate heading as required by California Rules of Court, rule 8.204(a)(1)(B). Moreover, Carranco failed to object to the prosecutor's closing argument on this basis, much less seek an admonition, and therefore forfeited the issue on appeal. (*People v. Tully* (2012) 54 Cal.4th 952, 1037-1038.)

and intent factors" but admonished the prosecutor to "tread very lightly" and "not to focus on it . . . ."

The following day, the trial court questioned whether evidence the October 2009 shooting resulted in *death* should be excluded. The prosecutor argued against excluding such evidence on the ground it was relevant to establishing Carranco's intent to kill in the drive-by shooting involving Mena. Carranco responded that the issue was not relevance, but prejudice, and that evidence an individual died as a result of the prior shooting would be "overly prejudicial." The trial court determined such evidence was admissible, finding its strong probative value was not substantially outweighed by the potential for prejudice.

During the prosecutor's direct examination of Schumacher, the following exchange took place:

"Q     And are you familiar with the fact that Manuel Sotelo and Juan Carranco were involved in the shooting death of an out of town Norteño on October 31st, 2009?

"A     Yes.

"Q     About five weeks before this?

"A     Yes."

Before we determine whether Leong's rights were violated, we must decide whether he preserved his claim for appellate review. Although Carranco moved to bar Schumacher from referring to Carranco's involvement in the prior shooting, Leong did not join in the objection or interpose his own. Given the trial court's treatment of Carranco's objection, one certainly could argue that any objection by Leong would have been futile. (*People v. Wilson* (2008) 44 Cal.4th 758, 792-793.) Leong inexplicably fails to make any such argument, claiming only that "[i]f this court finds that defense counsel failed to object . . . , counsel was deficient for failing to do so." As we shall explain, even assuming the issue was preserved for review, it fails on the merits. Accordingly, Leong's trial counsel was not deficient. (*People v. Price* (1991) 1 Cal.4th 324, 387 [counsel's failure to make a futile or unmeritorious objection is not deficient performance].)

26

Although an expert is permitted to rely on extrajudicial statements as the basis for his or her opinion, "Evidence Code section 352 authorizes the court to exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value." (*People v. Montiel* (1993) 5 Cal.4th 877, 919.)

"Generally, the prosecution may not use a defendant's prior criminal act as evidence of a disposition to commit a charged criminal act. (Evid. Code, § 1101, subd. (a).) But evidence is admissible 'when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge . . .) other than his or her disposition to commit such an act.' (Evid. Code, § 1101, subd. (b).) [¶] 'To be admissible to show intent, "the prior conduct and the charged offense need only be sufficiently similar to support the inference that defendant probably harbored the same intent in each instance." ' [Citations.]" (*People v. Davis* (2009) 46 Cal.4th 539, 602.)

"In general, '[t]he People are entitled to "introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent." [Citation.]' [Citation.] '[E]ven where gang membership is relevant,' however, 'because it may have a highly inflammatory impact on the jury trial courts should carefully scrutinize such evidence before admitting it.' [Citations.] On the other hand, ' "[b]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." [Citation.]' [Citation.] On appeal, we review for abuse of discretion a trial court's ruling on whether evidence is relevant, not unduly prejudicial, and thus admissible." (*People v. McKinnon* (2011) 52 Cal.4th 610, 655.)

Here, Carranco's involvement in the shooting death of an out-of-town Norteño was properly admitted to explain Schumacher's opinion that the drive-by shootings were gang motivated, e.g. "committed for the benefit of, at the direction of, or in association with any criminal street gang . . . ." (§ 186.22, subd. (b).) Such evidence tended to show

that Norteños did not limit their violent acts to members of other gangs; rather, they sometimes targeted rival subsets of the same gang. Such evidence was relevant in the trial of the two drive-by shootings because the alleged targets of those shootings (Lerna, White, & Anderson) all were members of a rival Norteño subset. In addition, Carranco's relationship with Manuel Sotelo provided a possible motive for the drive-by shooting at 7512 17th Avenue insofar as Anderson, who identified Manuel Sotelo's brother (Tony Sotelo) as the shooter in a prior homicide, lived there until just prior to the shooting. That Carranco and Manuel Sotelo were involved in a shooting five and one-half weeks prior to the drive-by shootings also tended to show that their relationship was ongoing.

The evidence's probative value was not outweighed, substantially or otherwise, by any potential prejudice to Leong. The testimony concerning the October 2009 shooting was very brief, and the description of the incident was relatively mundane; Schumacher did not say that Carranco was the shooter, much less that he shot the victim in the head. He simply indicated he was "familiar with the fact that Manuel Sotelo and Juan Carranco were involved in the shooting death of an out of town Norteño on October 31st, 2009." Moreover, the trial court reduced the likelihood of any undue prejudice when it instructed the jury consistent with CALCRIM No. 1403 that evidence of gang activity could not be considered to prove that the defendant was of bad character or had a disposition to commit crime. We presume the jury understood and followed this limiting instruction. (*People v. Lindberg* (2008) 45 Cal.4th 1, 26.)

We reject Leong's contention that evidence concerning the October 2009 incident was irrelevant to the issue of intent because "[a]lthough one can assume that shooting a Sureño would be for the benefit of the Norteños, it makes no sense that killing a fellow Norteño would benefit the Norteños." The jury reasonably could conclude that shooting at someone who is perceived to be a member of a rival Norteño subset (Mena) benefitted the Norteños by instilling fear in the community at large, and that shooting at what was believed to be the home of a fellow Norteño who was perceived to be a "snitch"

28

(Anderson) benefitted the Norteños by discouraging others from engaging in similar conduct.

Finally, we need not consider Leong's additional contention that even assuming Schumacher's testimony concerning Carranco's involvement in the shooting was admissible, his testimony that it resulted in *death* violated Leong's right to due process of law because any error was harmless under any standard.

Again, the testimony concerning the October 2009 shooting, including the fact that it resulted in death, was extremely brief. Moreover, the jury was given a limiting instruction. Furthermore, the prosecutor did not emphasize the prior shooting, much less the fact that it resulted in death, during his closing argument, arguing only that the incident established a connection between Carranco and Manuel Sotelo five weeks before the drive-by shootings. Finally, the evidence of Leong's guilt was overwhelming. The drive-by shootings occurred minutes apart. The Taurus was observed fleeing the area near 17th Avenue minutes after an officer reported hearing shots. Leong was seated in the front passenger seat when the pursuit ended, and the person who fired the shots along Falconer Way was seated in the front passenger seat of the Taurus. Leong had gunshot residue on his hands two hours after the shootings. Shell casings recovered from the scenes of both drive-by shootings and from inside the Taurus were fired from the same semi-automatic gun. Mena identified the Taurus that was involved in the pursuit as the same car that was involved in the shooting on Falconer Way. On this record, any error in allowing Schumacher to testify that Leong's codefendant previously was involved in the shooting death of an out-of-town Norteño as a basis for his opinion the drive-by shootings were gang motivated was harmless under any standard.

## III

### Defendants Forfeited Their Claim That They Were Denied Due Process When Schumacher Purportedly Gave False Testimony and the Claim Lacks Merit in Any Event

Defendants next contend that their rights to due process of law were violated when Schumacher "falsely" testified that Torres committed the crime of attempted murder on July 15, 2007, and the prosecutor failed to correct the error. The claim is forfeited because defendants did not object below. (*People v. Marshall* (1996) 13 Cal.4th 799, 830-831; *People v. Morrison* (2004) 34 Cal.4th 698, 714.) In any event, the contention fails on the merits. As we shall explain, we are not persuaded that Schumacher's testimony was inaccurate, and even assuming that it was, the prosecutor corrected the error. Moreover, there is no reasonable likelihood the testimony affected the jury's judgment. (See *People v. Dickey* (2005) 35 Cal.4th 884, 909.)

During both trials, the prosecutor asked Schumacher if he was "familiar with the crime of attempted murder committed by Mr. Torres on July 15th, 2007." In each instance, Schumacher responded, "Yes" and explained that during an altercation with a group of people he perceived to be rival gang members, Torres picked up a metal trash can lid and threw it through the driver's window of the victim's car, striking the victim in the face. Defendants claim that this testimony was false because Torres was not *convicted* of attempted murder as a result of this incident.

"A prosecutor's presentation of knowingly false testimony [citation], or the failure to correct such testimony after it has been elicited [citation], violates a defendant's right to due process of law under the United States Constitution. [Citations.]" (*People v. Vines* (2011) 51 Cal.4th 830, 873-874.) "When the prosecution [introduces and then] fails to correct testimony of a prosecution witness which it knows or should know is false and misleading, reversal is required if there is any reasonable likelihood the false testimony could have affected the judgment of the jury. This standard is functionally equivalent to the ' "harmless beyond a reasonable doubt" ' standard of *Chapman v.*

30

*California* (1967) 386 U.S. 18. [Citation.]" (*People v. Dickey*, *supra*, 35 Cal.4th at p. 909, italics omitted.)

First, we question whether Schumacher's testimony that Torres *committed* the crime of attempted murder on July 15, 2007, was inaccurate. The testimony, along with other evidence, was offered as a basis for Schumacher's opinion that the Norteños were engaged in a pattern of criminal gang activity. Subdivision (e) of section 186.22 defines " 'pattern of criminal gang activity' " as "*the commission of, attempted commission of, . . . or conviction of* two or more" enumerated offenses. (Italics added.)[8] "Because section 186.22, subdivision (e) contains both the options of 'commission' or 'conviction,' the statute expressly does not require that the offense necessarily result in a conviction." (*People v. Garcia* (2014) 224 Cal.App.4th 519, 524; *In re I. M.* (2005) 125 Cal.App.4th 1195, 1207-1208 [evidence that a gang member was prosecuted for an offense, without a showing that he was convicted, was sufficient evidence of "commission" of predicate offense for pattern of criminal gang activity].)

Here, Schumacher testified that during a confrontation with a group of perceived rival gang members, Torres picked up a metal trash can lid and threw it through the driver's window of the victim's car, striking the victim in the face. While Torres was not charged with or convicted of attempted murder in connection with that incident, a juror reasonably could conclude that Torres intended to kill the driver of the car by intentionally throwing a metal trash can lid at his head with such force that it broke the driver's window, and thus, committed the offense of attempted murder for purposes of subdivision (e) of section 186.22. (*People v. Ervine* (2009) 47 Cal.4th 745, 785

---

[8] The jury was instructed consistent with subdivision (e) of section 186.22 as follows: "A pattern of criminal gang activity as used here, means the commission of, or conviction of any combination of two or more of the following crimes . . . : Attempted murder, shooting at an occupied vehicle or assault with a firearm." (See CALCRIM No. 1401.)

["Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing."].)

Even if Schumacher's testimony was inaccurate, the prosecutor corrected it. People's exhibit No. 67 (first trial) and exhibit No. 2 (second trial), referred to by the prosecutor during his closing arguments and submitted to the jury, showed that Torres had been charged with assault and felony vandalism in connection with the July 15, 2007, incident and had pleaded no contest to felony vandalism in exchange for dismissal of the assault charge.

Finally, there is no reasonable likelihood that Schumacher's testimony that Torres committed the crime of attempted murder on July 15, 2007, affected the judgment of the jury in either trial. (See *People v. Dickey, supra,* 35 Cal.4th at p. 909.) Significantly, it was never suggested that either defendant was involved in the July 15, 2007, incident. Moreover, the misstatement, to the extent there was one, was very brief, and was not repeated by the prosecutor during his closing. To the contrary, the prosecutor did not mention the July 15, 2007, incident in either of his closing arguments. During his closing argument in the first trial, he focused solely on the September 2007 incident involving Torres. During his closing argument in the second trial, he referred to the court documents "showing the convictions" of Torres and Martinez "for the crimes that Detective Schumacher talked about, shooting into a car, attempted murder, assaults, that sort of thing, okay? [¶] That's what those documents are. You can take a look through them. The only purpose is to prove that this is a gang by legal definition." Contrary to Carranco's assertion, the prosecutor's argument was proper. The court documents, to which the prosecutor referred, showed that Torres had been charged with two counts of attempted murder in connection with the September 2007 shooting and had pleaded no contest to two counts of assault with a deadly weapon, and a jury had found Martinez guilty of attempted murder and maliciously discharging a firearm at a motor vehicle in August 2007.

Carranco argues Schumacher's testimony lowered the prosecution's burden of proof because "an expert witness testified that Torres committed attempted murder by throwing a garbage can lid at the victim. The jury was instructed that attempted murder required intent to kill in the first trial and that murder required malice in the second trial. [¶] . . . When a police officer gang expert falsely testified that another fellow gang member who threw a garbage can at a victim was convicted of attempted murder, the comparison with [defendant's] behavior in two incidents in which guns were used, cannot but be seen as having lightened the prosecutor's burden of proof." As detailed above, Schumacher did not testify that Torres was *convicted* of attempted murder as a result of the July 15, 2007, incident, and the jury was instructed that a pattern of criminal gang activity means the *commission* or *conviction* of certain enumerated offenses. Moreover, the prosecutor did not refer to the details of the July 15, 2007, incident during his closing arguments at either trial, much less compare that incident to the drive-by shootings or homicide at issue in those trials. To the contrary, the prosecutor told the jury that the purpose of the predicate offense evidence is to prove that the Norteños are a gang.

Moreover, evidence of intent to kill was overwhelming with respect to both the shooting involving Mena and that involving Cervantes. The jury in the first trial found true the allegation Leong intentionally and personally discharged a firearm in the commission of the attempted murder of Mena. Moreover, the evidence adduced at trial showed that: ten shots were fired, at least one of which struck Mena's car; before the shots were fired, Carranco slowly drove past Mena as Leong looked around, and then circled back around; Mena resembled a rival gang member who was known to frequent the Dewey Garden Apartments; and Mena drove a car similar to the car driven by the rival gang member. That only one or two of the ten bullets fired struck Mena's car is of no consequence. The jury in the second trial found true the allegation Carranco intentionally and personally discharged a handgun, and thereby proximately caused death

33

to Cervantes. Intentionally discharging a handgun at someone's head is powerful evidence of an intent to kill.

For all the foregoing reasons, we conclude defendants were not denied their rights to due process of law as a result of Schumacher's testimony that Torres committed the crime of attempted murder on July 15, 2007.

IV

Leong Was Not Denied His Right to a Fair Trial as a Result of a Hypothetical Posed to the Gang Expert or the Expert's Response Thereto

Leong contends he was denied a fair trial because the facts in a hypothetical question posed to the prosecution's gang expert were not supported by the evidence, and the gang expert used the incorrect facts to conclude Leong had an intent to kill. As we shall explain, Leong forfeited his claim by failing to raise it below, and in any event, it lacks merit.

At trial, the prosecutor posed the following hypothetical to Schumacher: "[T]here are six Norteño gang members of either 14th Avenue or Fruitridge in a car. [¶] They come across -- they drive to an area that is a rival Norteño set's area, Diamonds' area. They see a man who resembles, both physically and by the car he's heading towards, a rival Diamonds' gang member, and they shoot approximately ten times at that person. [¶] Would you have an opinion as to whether that crime was committed for the benefit of or, in association with the Norteño criminal street gang?" Schumacher responded, "I would say that it most definitely was," explaining: "First, I think you have to look at who was in the car. [¶] You have, from my opinion, you have three from Fruitridge Norteños. You have three from 14th Avenue Norteños, so it's kind of a coalition, if you will, of forces. [¶] And they're -- by shooting someone, they may perceive to be a rival gang member, they're trying to eliminate him. [¶] So they were trying to eliminate [someone] who they perceive to be a rival gang member."

34

Leong claims the prosecutor prejudicially erred "in exaggerating the facts when he said that the hypothetical gang members shot ten times at a man in the Diamonds' area," and that the error was compounded when the gang expert "used the incorrect facts to conclude that all the persons in the car intended to . . . kill someone they perceived to be a rival gang member."

Leong forfeited his claim by failing to object to the prosecutor's hypothetical or the expert's response thereto below. (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 818-819.) In any event, his claim fails on the merits.

" 'Generally, an expert may render opinion testimony on the basis of facts given "in a hypothetical question that asks the expert to assume their truth." [Citation.]' [Citation.]" (*People v. Vang* (2011) 52 Cal.4th 1038, 1045.) " 'Such a hypothetical question must be rooted in facts shown by the evidence . . . .' [Citations.]" (*Ibid.*) " ' "The statement may assume facts within the limits of the evidence, not unfairly assembled, upon which the opinion of the expert is required, and considerable latitude must be allowed in the choice of facts as to the basis upon which to frame a hypothetical question." [Citation.] On the other hand, the expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors . . . ." ' [Citations.]" (*Id.* at p. 1046.)

Leong claims the prosecutor's statement that ten shots were fired at the victim was not within the limits of the evidence. He insists that if ten shots had been fired at Mena, ten spent bullet projectiles would have been found near the scene, and the shell casings would have been found closer to Mena's vehicle. We disagree. There was overwhelming evidence that Mena was the target of the gunshots. The evidence showed that the Taurus slowly drove past Mena as he was walking to his car. The Taurus then circled back around, and as Mena was driving down Falconer Way, a male seated in the front passenger seat began shooting. One of the shots hit the passenger door of Mena's car, and his back window shattered. Ten spent shell casings were found within 30 feet of

the intersection of Falconer and Dewey, and one bullet projectile was found near the apartment complex's laundry room.

Leong also claims that the evidence did not show that Mena was walking towards his car when the shooting began. The prosecutor did not state that the victim was walking towards his car when the shooting started. Rather, he stated that the man observed by the occupants of the car "resembles, both physically and by the car he's heading towards," a rival gang member. The point of the statement was that the victim drove a car similar to that driven by the rival gang member, not that he was walking towards the car when the shots were fired. The prosecutor's statement was supported by Trejo's testimony that the apartment manager's grandson, Eddie Lerna, resembled Mena and drove a similar car. In any event, whether the victim was inside his car or walking towards it when the shooting started had no bearing on the issue of intent to kill.

Because we find the challenged facts were rooted in the evidence, we need not consider Leong's claim that Schumacher "used the incorrect facts to conclude that [Leong] and the other occupants of the car had an intent to kill." To the extent Leong contends that Schumacher impermissibly testified that Leong and the other occupants of the Taurus had an intent to kill, the contention lacks merit. Assuming Leong is correct that a gang expert may not opine on whether a "specific individual had specific knowledge or possessed a specific intent" (*People v. Vang, supra*, 52 Cal.4th at pp. 1047-1048); Schumacher did not opine that Leong or any specific individual had an intent to kill. Rather, he opined that the hypothetical individuals described in the hypothetical had an intent to kill. The prosecutor expressly stated he intended to pose a hypothetical, and the jury was instructed "[a] hypothetical question asks the witness to assume certain facts are true and to give an opinion based on the assumed facts." To the extent Schumacher's opinion could be understood as referring to Leong and the other occupants based on his statement that there were three from Fruitridge and three from 14th Avenue in the car, the error was harmless under any standard. As set forth above, there is substantial evidence

36

from which a reasonable juror could infer that Leong intended to kill Mena when he fired the shots.

V

The Trial Court Abused Its Discretion in Admitting a Tape Recording of Telephone Calls Made While Defendants Were in the Backseat of the Patrol Car, but the Error Was Harmless

Defendants next contend the trial court abused its discretion in allowing the prosecution to play a recording of cell phone calls made while defendants were alone in the backseat of the patrol car because the prosecution failed to lay an adequate foundation as to which defendant made the statements. We agree the trial court abused its discretion in admitting the tape recording but find the error was harmless under any standard.

During the first trial, the prosecution sought to introduce portions of a tape recording of cellular telephone conversations that occurred while defendants were alone in the backseat of Knecht's patrol car. According to the prosecutor, the recording was admissible because during one of the conversations one of the defendants admitted to disposing of the gun during the pursuit. Leong's trial counsel moved to exclude the tape recording because the prosecutor could not establish which of the defendants made the purported admission. Specifically, Leong's counsel argued that "unless [the statements] can be identified as coming from the lips of my client, it should not be admissible against him." The prosecutor responded that "a sufficient foundation's been laid that it's an admission of a party opponent, without the ability to identify which opponent, but there will be information from which [the prosecution] can argue to the jury one or the other and leave it to the jury to decide." The trial court found that "a sufficient foundation has been laid for it as an admission of a party opponent" and indicated that it would instruct the jury that the evidence "is only relevant, if at all, if they found the foundational facts that allow them to attribute a statement to a particular defendant."

At trial, Knecht testified that defendants were alone in the patrol car when the tape was made. Knecht was unable to identify the voices or otherwise describe which

37

defendant made which statements. A tape recording of the two conversations was played for the jury. The first conversation was between an unidentified male and an unidentified female. The male first explained that he was "in the back of the cop car" and instructed the female to "stop talking." Thereafter, the following conversation ensued:

"UNID FEMALE:   Were you clean?

"UNID MALE:       Yeah.  Yeah

"UNID FEMALE:   Yeah?

"UNID MALE:       Yeah.

"UNID FEMALE:   What about the other guys?

"UNID MALE:       Who is this?

"UNID MALE:       Yeah.

"UNID MALE:       Yeah, I'm going to jail, cuz.

"UNID MALE:       Hey

"UNID FEMALE:   (Unintelligible).

"UNID MALE:       High speed.

"UNID MALE:       I don't know, man.

"UNID MALE:       (Unintelligible)  I gotta go.

"UNID MALE:       High speed.  Yeah (unintelligible).  But I'm going to jail, my nigger.  No, I ditched it.

"UNID FEMALE:   (Unintelligible).

"UNID MALE:       (Unintelligible) my bad.

"UNID FEMALE:   (Unintelligible)

"UNID MALE:       Hello?

"UNID MALE:       On Martin Luther King.

"UNID MALE:       Hey.  What are you doing?  By the exit?

"UNID FEMALE:   (Unintelligible).

"UNID MALE:       Yeah.

38

"UNID MALE:          You can't sleep?

"UNID MALE:          It's on the right side.

"UNID MALE:          He can't sleep.

"UNID MALE:          (Unintelligible).

"UNID MALE:          Hey, you gonna write me?

"UNID FEMALE:     (Unintelligible).

"UNID MALE:          You gonna write me?

"UNID MALE:          For high speeding.

"UNID FEMALE:     (Unintelligible).

"UNID MALE:          Smokey

"UNID MALE:          Me.

"UNID MALE:          Huh?

"UNID MALE:          Yeah.

"UNID MALE:          You better.

"UNID FEMALE:     (Unintelligible).

"UNID MALE:          Don't play around like last time."

The tape recording was admitted under the admissions exception to the rule against hearsay.  (Evid. Code, § 1220.)  Evidence Code section 1220 permits the introduction of evidence of a statement as an exception to the rule against hearsay "when offered *against the declarant* in an action to which he is a party . . . ."  (Italics added.) Evidence Code section 403, subdivision (a), provides, in pertinent part:  "The proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact, when:  [¶] . . . [¶] (4) The proffered evidence is of a statement or other conduct of a particular person and the preliminary fact is whether that person made the statement or so conducted himself."  The comment by the Assembly Committee on Judiciary following

Evidence Code section 403 indicates, as to admissions of a party under Evidence Code section 1220, "The only preliminary fact that is subject to dispute is the identity of the declarant. Under [Evidence Code] Section 403 [subdivision] (a)(4), an admission is admissible upon the introduction of evidence sufficient to sustain a finding that the party made the statement. . . ." (Assem. Com. on Judiciary com., reprinted at 29B pt. 1B West's Ann. Evid. Code (2011) foll. § 403, p. 20.)

When the existence of a preliminary fact is at issue, "the proffered evidence is inadmissible unless the trial court finds there is sufficient evidence to sustain a finding of the existence of the preliminary fact. [Citation.] That is, the trial court must determine whether the evidence is sufficient for a trier of fact to reasonably find the existence of the preliminary fact by a preponderance of the evidence. [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1120, disapproved on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) "A trial court's decision as to whether the foundational evidence is sufficient is reviewed for abuse of discretion. [Citation.]" (*People v. Guerra*, at p. 1120.)

As a preliminary matter, we reject the People's assertion that Carranco forfeited the claim by failing to join in Leong's objection or interpose his own. " 'Generally, failure to join in the objection or motion of a codefendant constitutes a waiver of the issue on appeal.' [Citation.]" (*People v. Wilson, supra,* 44 Cal.4th at p. 793.) "A litigant need not object, however, if doing so would be futile." (*Ibid*.) Given the trial court's treatment of Leong's objection, Carranco's trial counsel reasonably could have concluded that an objection would have been futile. (*Ibid*.)

Turning to the merits, there was no showing to support a finding as to the identity of the speaker. The prosecutor conceded as much at trial, "The reality is I don't know how we would prove who is speaking. . . . [I]f both defense attorneys want to stipulate who the speaker is, I'm happy to take that stipulation. But absent that, the fact that we can't figure out exactly which of the people at the table is saying it is beyond our control. . . . [W]e can craft . . . [a jury] instruction that says you can only attribute it against the

40

speaker. But I don't know how they're going to determine who the speaker is." The prosecutor's assertion during closing argument that Leong made the statements in question because the speaker said he was going to jail and Carranco, who was 17, was going to juvenile hall amounts to pure speculation. Accordingly, the trial court abused its discretion in admitting the tape recording. As we shall explain, however, the error was harmless given the overwhelming evidence linking defendants to the two drive-by shootings.

The Taurus was observed fleeing the area near 17th Avenue minutes after Officer Valenzuela reported hearing shots. The Taurus led law enforcement on a high speed chase before it was forced to stop due to mechanical problems. When the pursuit ended, Carranco was seated in the driver's seat and Leong in the front passenger seat. Both had gunshot residue on their hands two hours after the shootings in question. Shell casings recovered from the scenes of both drive-by shootings and from inside the Taurus were fired from the same semi-automatic gun. Mena identified the Taurus driven by Carranco as the same car that was involved in the shooting on Falconer Way. The shootings occurred minutes apart. The person who fired at Mena was seated in the front passenger seat. On this record, any error in admitting the tape recording was harmless under any standard.

VI

Defendants Were Not Denied a Fair Trial as the Result of the Cumulative Impact of Any Errors Found or Assumed

Finally, defendants contend the combined effect of the errors asserted on appeal requires reversal even if no error is prejudicial on its own. For reasons we have explained, any errors we have found or assumed were harmless under any applicable standard. Any conceivable cumulative prejudicial effect does not establish that Leong was denied due process of law or a fair trial. Therefore, the claim lacks merit. (See *People v. Contreras* (2013) 58 Cal. 4th 123, 173.)

41

DISPOSITION

The judgments are affirmed in their entirety.

    BLEASE        , Acting P. J.

We concur:

    HULL        , J.

    BUTZ        , J.